People v. Reed, 514-0292 and 514-0293. Counsel for appellant, you may proceed. May it please the Court, Counselor. My name is Lawrence O'Neill and I represent Glenn and Glenn Reed in this appeal that has been consolidated for purposes of oral argument and decision. This appeal is from the trial court's denial of their motions for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure following a hearing. I ask this Court to reverse the trial court's order and remand the case for the requested DNA and fingerprint testing. The brothers, Glenn and Glenn Reed, were convicted by a jury of murder, hijacked and found at the death of Michael Luther in 1994. At trial, Andre Cunningham, who received immunity for his testimony, testified that he, the Reeds, and Heather Reed participated in these crimes. Reed acted as a prostitute and solicited Euford while the Reeds and Cunningham watched from afar. Weedon and Euford drove off in Euford's Mustang with the Reeds and Cunningham following. Euford and Weedon stopped in an isolated rural area. The Reeds and Cunningham pulled up and then, according to Cunningham, Leonard shot Euford, gave the gun to Glenn. He shot him and then Cunningham also shot him. The next day, the police found Euford's body in an isolated rural area. About a mile from where the body was found, police discovered Euford's abandoned and wrecked Mustang. Fingerprint impressions were lifted from the exterior of Euford's car. They were compared. But these were fingerprint lifts, right? Yes. So a little bit different than some other kinds of fingerprint analysis. Well, that's true. I mean, I apologize for interrupting you, but I think we know the facts of the case. My question is to you. So you want the hair tested and you want the DNA from the lifts tested. Is that true? The motion requested regarding the fingerprints, that the fingerprints be run through the FBI's AFIS database and that the touch DNA be performed on the fingerprint lift impressions also. And then regarding the hair, the request is to have the hair submitted to the FBI database also. But the record that was supplied by the state as the hair shows that there was some confusion in the record and that there is no hair and that your client did not produce any evidence showing that there exists some hair. So how do we do an analysis on a piece of hair that nobody knows where it is? Well, Your Honor, in my reply brief, I responded to that. Now, at the trial, defense counsel for Len Reed asked the detectives, the question is, were you able to look at any hair samples from Len Reed near the airbag? And then Nod went on to answer, when you can't say it belongs to anyone in particular, it doesn't belong to Reed. Okay. So that's where the origin of this, the existence of the hair begins. Now, opposing counsel then discusses how later in Nod's testimony, Nod then in response to the judge's question, whether it was a particular hair, and then the prosecutor asked, do, Nod said, no, there wasn't any hair found. Okay. So that's the basis for the state's argument that there was no hair. However, subsequent to trial, the Reeds had filed a post-conviction petition alleging that the trial counsel was affected for not having the hair tested. It goes to a hearing. Both defense counsels testified in this hearing and testified that there was a hair. And not only did they testify that there was a hair, I guess basically, but also they discussed with the client and considered it as trial strategy whether they have the test, whether they have the hair tested. So the, you know, both trial counsels determined that since there was no physical evidence linking the Reeds to the crimes, and that the only evidence was the uncooperated testimony of an accomplice, Andre of Cunningham, the defense counsel's strategy decided not to have the hair tested. Now, the prosecutor, from what I understand from the record, did not contest that the hair did not exist at that point. So the judge did not find that there was no hair. But the easy answer is you drop a subpoena on the crime lab to determine whether there's a hair. I mean, or you have a chain of custody document that somebody looks at and sees if it's booked into evidence. But none of that seems to be to have been done. And I think, isn't it your burden in this motion to show that there is a hair, that there is some chain of custody document, or there is drop a subpoena and see if they can produce a hair? Well, you're correct that that was not done here, Your Honor. So how are we supposed to really know that there's a hair? Well, there's a record. There's a sufficient record to conclude on a primary basis that the hair exists. Just because people are talking about it? Correct. For the purposes of remanding the motion for forensic testing, then let me determine whether there's a hair. Wasn't that your burden to begin with? And I submit that they meant it by referring to Don's testimony and then Don clarified, subsequently answered that there was no hair. But I submit that that was a response to, an ambiguous response to a poorly asked question. And then in the subsequent hearings, there was, you know, it was well documented, well established by the trial attorneys and Mr. Reed's affidavit and so on and so forth, that there was a hair and it was discussed. And the State didn't establish that that was not true. So I submit that the record is sufficient here in order to grant the motion to request to have the hair tested. Now, what about this DNA? It appears that the State argues you can't do a DNA from a lift or touch DNA. Well, I don't think the State has established that. They're referring to David Peck's testimony at the hearing here. Yes. Now, first of all, I think that Peck's testimony was speculative and not conclusive as to whether a lift can be done here. Now, we know that touch DNA can't be performed. Peck testified at the hearing. Touch DNA can't be obtained through fingerprint residue. We know that. Okay. So that is a showing that that's accepted in the scientific community. And to be granted the testing, all that we have to show is that there is scientific potential that this test will result in new evidence that will materially advance the defendant's claims of actual innocence. Now, the fact that touch DNA evidence is accepted in the scientific community, that is sufficient to show that there is a scientific potential that it could be, that it could produce evidence that would material, that are material relevant to the claim of actual innocence. I don't think that it might have submitted to this Court that the testimony of Peck at this subject hearing did not establish that this DNA could not be obtained and submitted. And actually, the trial court did not find, and its ruling did not rule, that this, that the DNA could not be obtained in this way either. So I think that, you know, that's getting the court, the carpet before the horse to say that this evidence, the DNA evidence, could not be obtained here because it is an accepted method. Touch DNA is an accepted method of, in the scientific community, and it has the potential. The difficulty of whether the results would be, you know, beneficial or even, you know, probative is different than, it should not be a bar to allowing the test to occur. Again, I think that's getting the court before the horse. I think we can both agree that touch DNA is scientifically accepted in the community. The question is whether you can get touch DNA from a fingerprint lift. That's correct. And that's the issue. I understand. Do you argue that the ability to get DNA from a fingerprint lift, such as here, is a scientifically recognized procedure, that there's a technique that you can do that, that there's a scientific basis for that? I don't think the record establishes that it cannot be done. And I think that it is, it provides a, it meets the statute's requirement of scientific potential. Well, but you have to have a scientific, it has to be accepted in the scientific community, and it seems that Peck says you can't do it. Well, again, Peck did not look at the actual fingerprints. No, but he was talking generically. And he was talking about reports. Yes, again, and that's why I'm submitting that that is not, Peck's testimony is not sufficient to establish that this is not accepted in the scientific community. And I submit that it has the scientific potential to produce. I would like to hear it again if you don't mind. You can finish your point, Mr. O'Connor. I was just going to say this has the scientific potential to produce test results materially relevant to the Reed's claim of actual nymphs. Thank you. Thank you. Counsel for the State. May it please the Court. Counsel. Jennifer Camden on behalf of the people. I'll start with the touch DNA issue. The defendant argues that a test need only have the potential to yield materially relevant evidence in the reply on 11 and 12. He cites a case called Hockenberry. This exact argument cited in the Hockenberry case was rejected by the appellate court in the Slover case, which is cited in the people's brief. The concept of potential refers to the potential of a test to yield evidence that's material to the claim of innocence. Not to the potential that a test is possible to perform. The issue in Hockenberry was whether a DNA test of seminal fluid would be material to a defendant's claim of innocence and sexual assault. The issue in Hockenberry wasn't whether the samples were testable. As Justice Case pointed out, a touch DNA test is a scientifically recognized method of testing. But the assistant director of the Illinois State Police Crime Lab, who himself was a former latent print examiner, testified that to his knowledge, there's no way of removing the tape off of a print lift to try to get at the DNA. Quote, so to my knowledge, that's never been attempted, to try to peel the tape away from a lift and make a touch DNA comparison to that. In fact, he didn't even know whether such a method was even being researched as plausible. And so to prevail on Section 116-3 motion, the defendant must do more than propose a new type of testing that the assistant director of the State Police Crime Lab has never heard of. And although the defendant argues that the test, the requested test may be difficult, Peck didn't say that it would be difficult. He said it had never been tried to his knowledge. If the court has no other questions about the touch DNA testing issue, I'll move to the hair issue. The defendant today stated that the following was a, quote, ambiguous response to a poorly worded question. Here's the question. Did you find a hair? Non's answer, no. That was the testimony at the defendant's trial. What preceded that, immediately preceded that, and this is at pages 184 and 185, was compound questioning by defense counsel to Detective Non, which the court interrupted and said, you have a compound question. Are you asking if he found a hair? And that's what prompted defense counsel to ask if he found a hair. And then in the redirect examination, the state removed any doubt on redirect on page 186. Question, there weren't any hairs found, right? Answer, no. Question, from anybody? Answer, no. The defendant argues that the initial compound question, which was later unambiguously cleared up, is the proof, the only record proof, of the existence of a hair found on the airbag. Now, as Your Honor astutely noted, what occurred after that, in the intervening, what's it been, 15 years, has been a series of hearings at which non's initial compound questioning has been remembered or misremembered or misreported or misrepresented as constituting proof of the existence of a hair found on the airbag. Now, the reply at page 4 suggests that, well, perhaps the hair sample was collected by the tapings from the seats of the victim's car because there was evidence that there were some hairs found on the tapings of those seats. But those aren't hairs found on the airbag. And that's not what the defendant asked for testing of, not in the petition that was filed in the circuit court and not in the opening brief in this court. And while the reply brief asks in the alternative for an order for testing of the hairs found on the seat, that's not what the defendant asked for below. And furthermore, those hairs could have been anywhere on either seat. We don't know if they were on the driver's seat or passenger seat. In fact, the Illinois State Police report on hair evidence states that just that four hairs were found on the tapings of the seats of the driver's and passenger's seat. So we don't know whether they were in front, the back, or the headrest or the place where you sit. And furthermore, we already know that those hairs can't have belonged to either of the defendants because the State Police report identifies those four human hairs found as having been deposited by a Caucasian donor. The defendants are African American. So I question whether any DNA testing of the hairs found on the seats would yield materially relevant evidence that's non-cumulative because the defendants have already been excluded as donors of those hairs. Furthermore, and as the State argued in Issue C related to when the fingerprints on the car could have been deposited, all of that is equally true with regard to when the hairs on the seats could have been deposited as well. They could have belonged to the victim or the victim's family or friends. And to make the case even more complicated, the victim apparently wore a toupee, a toupee made of human hair. So those hairs could have been grown by the donor or donors of whoever donated the hair that made up that hair piece. Well, but the hairs on the seat, I mean, I understand the defendant is trying to exclude themselves. So, I mean, the hairs on the seat, if they're Caucasian, for example, at least it could be argued that that shows that they weren't there. I mean, that's their whole defense, isn't it? But you're telling me they have never asked for those to be tested. Not in the court below, Your Honor, and not in the opening brief in this court. Now, the defendant in the Rook Library states that this court should review that filing with a lenient eye and that it should be read broadly enough to encompass testing of the hairs on the seats. But my response is that, well, the defendant cites this Johnson case as support for that request. But in Johnson, the defendant requested testing of a rape kit, and the court ruled on the testing of a rape kit. It doesn't stand for the proposition that a petition can be construed to request relief other than that which the defendant seeks. And also, even in the closing argument of the hearing that resulted in this, in the order that's currently being appealed, the defendant was requesting the testing of the hairs that he was saying that Detective Nahn testified about, and that was, that the defendant argued was the testing on the airbag. Was there actually a question of whether the, whether testing of the hairs could exclude the defendants? I mean, again, number one, the defendants have already been excluded by virtue of the Illinois State's police identification of the ethnicity of the donors. But also, again, and I point the court toward Issue C of the People's Brief, just like the fingerprints on the car could have been deposited at any time before or after the events that are the subject of this case, so too could hairs have been deposited at any time. So in the Section 116-3 cases in which testing has been ordered, there's been a very clear and direct line between the evidence that sought to be tested and the crime itself. The best example, there are multiple examples of this cited in both parties' briefs, examples involving testing of stoma fluid or rape kits in cases of sexual assault. I mean, one case describes that as showing, as having the potential to yield evidence that would be, quote, But here, even if one were to identify the donors of the hairs deposited on one or both of the victims' car seats at some indeterminate time, that wouldn't yield evidence that would be antithetical to the State's theory of the case because the hairs could have been deposited in the days or weeks or months prior to the crimes here. If the Court has no further questions, I'll ask that the Court affirm. Thank you, Counsel. Rebubba? The purpose of the statute is to produce possible exculpatory evidence to advance the defendant's claim of actual innocence. And I think that we're talking about some more technical obstacles here to deny the test before it occurs. I think that the purpose of the statute will be further advanced if, in this case, if the prima facie showing of that identity was an issue of trial, that there was a chain of custody, and that there is a scientific potential, both for the DNA on the hair, running the fingerprints through the FBI's FIS database, we haven't discussed that, and touch DNA testing of the fingerprint list. I think if you consider the closeness of the evidence and that there is a great deal of the defendant's claim was based upon somebody else committing a crime, if there was evidence that produced out of this, new evidence, that showed another suspect either through the fingerprint testing on the car, running through a database of other felons, or the hair that was sufficiently established in the record to be tested, if there's any kind of positive result from those tests, it would significantly advance the Reed's claim of actual innocence. In a case particularly close evidence, where this State had affirmed in the direct appeal, held that the conviction rests largely on an uncoordinated testimony of an active accomplice who testified with substantial self-interest. So identifying a different suspect, which can be done through touch DNA, through the FBI database, or submitting the hair through the FBI's CODI CODIS database, which David Peck testified is possible at the hearing, then I think the purpose of the statute is further advanced than denying the test before we know what the results would be. So I ask this Court to reverse the trial court and remand it for the requested DNA fingerprint test. Thank you, Counsel. Thank you. The Court will take the matter under advisement and issue a disposition in due course. Court stands adjourned for the day.